```
                 UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
```

JAMES SISTRUNK, ET AL                           CIVIL ACTION

VERSUS                                          NO: 13-2983

DAKE CORPORATION, ET AL                         SECTION: R(4)

## ORDER AND REASONS

Defendants Dake Corporation and JSJ Corporation move for summary judgment on plaintiffs James and Susan Sistrunk's claims under the Louisiana Products Liability Act.[1] Because plaintiffs fail to show that defendants should have reasonably anticipated Mr. Sistrunk's use of the product, the Court GRANTS the motion for summary judgment.

## I. BACKGROUND

This dispute arises out of a workplace accident from which plaintiff[2] James Sistrunk sustained injuries. The accident occurred on January 23, 2012, when plaintiff operated a 150-ton hydraulic press in the course of his employment with Pellerin Milnor Corporation. Plaintiff filed this suit against defendants, the manufacturer and designer of the press. Plaintiff alleges that the press was defectively designed and manufactured and that

---

[1] R. Doc. 55.

[2] Both James and Susan Sistrunk are plaintiffs in this case, but the Court refers to James Sistrunk as "plaintiff" in this Order.

defendants failed to warn under the Louisiana Products Liability Act.[3]

## A. Procedural History

Defendants filed a motion for summary judgment and a motion to exclude plaintiff's expert, Don Hansen.[4] Defendants set both motions for submission on January 14, 2015. On January 9, 2015, plaintiff filed a motion to continue the submission date and the trial date on the basis that counsel needed additional time to file memoranda in opposition to the motions.[5] On the same day, plaintiff filed response memoranda to defendants' motions.[6] The Court granted plaintiff's motion to continue on January 12, 2015, and extended the briefing schedule on the motions to allow plaintiff until February 11, 2015, to file supplemental memoranda in opposition.[7] The Court also continued the trial date and set new discovery deadlines.[8] Despite the Court's continuation of the briefing schedule, plaintiff filed no additional memoranda or materials in opposition to defendants' motions. On June 10, 2015, out of an abundance of caution, the Court ordered the parties to submit any supplemental briefing and/or evidence in relation to

---

[3]  R. Doc. 1-1.

[4]  R. Docs. 55, 56.

[5]  R. Doc. 63.

[6]  R. Docs. 65, 66.

[7]  R. Doc. 69.

[8]  R. Doc. 78.

defendants' motion for summary judgment and motion to exclude. On June 24, 2015, plaintiff filed a supplemental memorandum addressing defendants' motion to exclude, but offered no additional briefing or evidence as to the summary judgment motion.

**B. Summary Judgment Record**

*1. The Press*

In 1997, Pellerin purchased a 150-ton model 42-403 hydraulic power press manufactured by Dake Corporation.[9] Pellerin manufactures large commercial laundry machines and uses Dake's press to assemble and disassemble various component parts. The press is a generic hydraulic press that can be used for a number of purposes.[10] It exerts up to 150 tons of compressive force on objects placed inside of it. The press features a bed upon which the object to be pressed is placed. It also features a powered ram that travels vertically on two parallel tracks above the bed.

When Dake manufactured the press, it affixed to it a warning label.[11] Relevant here, one of the warnings states: "Guard workpiece to prevent projectiles from reaching operator. Wear eye protection."[12] The accompanying pictogram depicts a user being struck by projectiles on the head, torso, and leg.

---

[9]   R. Doc. 55, Ex. A at ¶17.

[10]  R. Doc. 55, Ex. G at ¶18-19.

[11]  R. Doc. 55, Ex. A at ¶20-21.

[12]  *Id.*

Dake shipped a product manual for the model 42-403 press with the press at the time of Pellerin's initial purchase.[13] The product manual includes an instruction that the safety labels affixed to the machine are to be kept in good condition and replaced when missing or damaged and that the owner of the press is to ensure that employees understand the warning labels.[14] The product manual further instructs: "Guard workplace to prevent projectiles from reaching operator.  Mount ½" below stop block or at eye level centered on flange as shown."[15]  The instruction is outlined by a box, which is connected by a line to a diagram of the press to demonstrate where the guard should be installed.[16]  According to Dake, because it does not know the intended use of its generic presses and because it does not know the size and shape of the objects that will be placed into its presses, it cannot provide a uniform, one-size-fits-all guard at the time of manufacture.[17]

In 1999, Pellerin paid Dake to make certain upgrades to the press, and Dake converted the press to a model 42-503 press.[18]  Part of that process included confirming all warning labels were on the

---

[13]    *Id.* at ¶19; R. Doc. 55, Ex. B at 18:5-12 (Deposition of Sidney LaCoste).

[14]    R. Doc. 55, Ex. C at 4.

[15]    *Id.* at 5.

[16]    *Id.*

[17]    R. Doc. 55, Ex. G at ¶18-19, Ex. A at ¶14.

[18]    R. Doc. 55, Ex. A at ¶24.

4

press.[19] This modification made the model 42-503 manual applicable to the press.[20] In 2001, in response to an order from Pellerin requesting a manual for the 42-503 model press, Dake mailed the 42-503 model manual to Pellerin as well as a duplicate set of warning labels.[21] The warning labels contained identical guard instructions as those already described.[22] The 42-503 press product manual contained identical instructions regarding the employer's duty to provide a guard against projectiles and the employer's duty to ensure that employees understand the warning labels affixed to the machine.[23]

### 2. The Accident

Plaintiff was injured on January 23, 2012, while operating the press as a Pellerin employee.[24] At the time of his injury, plaintiff was attempting to press a seal sleeve and old bearing off of a shaft.[25] Instead of using the specific tooling Pellerin manufactures for use with the press, plaintiff used an eight-inch long piece of scrap metal (the "scrap shaft") as an extension between the ram of the press and the piece of metal he intended to

---

[19] *Id.* at ¶27.

[20] *Id.* at ¶26.

[21] *Id.* at ¶29-30, 35.

[22] *Id.* at ¶36.

[23] R. Doc. 55, Ex. C at 4-5; Ex. D at 4-5.

[24] R. Doc. 55, Ex. H at 38:15-17 (Deposition of James Sistrunk).

[25] *Id.* at 58:12-59:2.

press.[26] The eight-inch scrap shaft was not affixed or attached to the ram in any way.[27] As he started to apply pressure with the press, plaintiff attempted to secure the eight-inch shaft under the ram of the press with his left hand, with his right hand operating the press's lever.[28] Once the ram of the press touched the bearing and scrap shaft, the scrap shaft shot out of the press, striking and injuring plaintiff.[29]

As stated, Pellerin provided its employees with tooling devices to be used for the same function for which plaintiff used the scrap shaft.[30] These tooling devices are machined pieces of tubing designed by Pellerin's industrial engineering department specifically to be used with the press.[31] These tooling devices eliminate the need to use anything to extend the ram of the press.[32]

After the accident, Frank Mamola, plaintiff's supervisor, created an accident report.[33] In the report, Mamola wrote that plaintiff "took [it] upon himself to use a non-tooling device to be

---

[26] *Id.* at 60:12-62:10.

[27] *Id.* at 62:11-15.

[28] *Id.* at 65:4-66:5.

[29] *Id.* at 66:7-15, 70:25-71:11.

[30] R. Doc. 55, Ex. F at 95:24-96:19.

[31] *Id.* at 96:1-97:1.

[32] *Id.* at 96:18-19.

[33] *Id.* at 87:17-89:13.

6

used on the 50-ton [sic] Dake hydraulic press."[34]  Mamola also noted that plaintiff's use of the scrap shaft to extend the ram was "improper use of the Dake hydraulic press."[35]  At the time of the accident, the approved tooling device was on the floor, next to the press.[36]  Dake's safety coordinator, Brian Phillips, testified that he has never heard of a consumer using a piece of scrap metal in its presses to extend the ram as plaintiff did.[37]

Despite the warning label and product manual instructing users to guard against projectiles reaching the operator, no safety cage or guard was installed on the press at the time of the accident.[38]  In his opposition to defendants' motion for summary judgment, plaintiff does not dispute that the press displayed the warnings at the time of manufacture and at the time of the accident.[39]

## II. Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[34]   Id. at 94:10-95:4; Ex. I at 2 (Pellerin's Accident Report).

[35]   R. Doc. 55, Ex. I at 2; Ex. F at 98:23-99:2.

[36]   R. Doc. 55, Ex. F at 100:9-12; Ex. J at 23:4-9 (Deposition of Timothy Ursin).

[37]   R. Doc. 55, Ex. A at ¶42.

[38]   R. Doc. 55, Ex. H at 37:11-17.

[39]   See R. Docs. 65 (Plaintiff's Opposition) & 65-1 (Plaintiff's Statement of Disputed Material Facts).

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-399 (5th Cir. 2008). The Court must draw reasonable inferences in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2738 (2d ed. 1983)).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quotation marks removed). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

8

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.

The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *Id.; see also Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (quoting *Celotex*, 477 U.S. at 322).

**III. DISCUSSION**

The Louisiana Products Liability Act ("LPLA") "establishes the exclusive theories of liability for manufacturers for damage caused by their products." La. R.S. 9:2800.52. Plaintiffs may not rely on negligence, strict liability, or breach of express warranty as a viable independent theory of recovery against a manufacturer. *Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1251 (5th Cir. 1997). The elements of a products liability claim under the LPLA

are "(1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product 'unreasonably dangerous;' and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else." *Jack v. Alberto-Culver USA, Inc.*, 949 So. 2d 1256, 1258 (La. 2007) (citing La. R.S. 9:280054(A)). "If a plaintiff's damages [do] not arise from a reasonably anticipated use of the product, then the 'unreasonably dangerous' question need not be reached." *Kampen v. Am. Isuzu Motors, Inc.*, 157 F.3d 306, 309 (5th Cir. 1998).

### A. Reasonably Anticipated Use

Defendants contend Dake's specific warnings against plaintiff's use of the press without guarding and industry custom mandating that employers, not manufacturers, supply guarding, render plaintiff's use unforeseeable. As a threshold matter, plaintiff must show that his injuries arose from a reasonably anticipated use of the product. *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 331 (5th Cir. 2001), *opinion amended on denial of reh'g*, 274 F.3d 881 (5th Cir. 2001). Under the LPLA, "if a manufacturer does not reasonably anticipate a plaintiff's use then he owes no duty to that consumer, and is not responsible for any damages caused by misuse." *Broussard v. Procter & Gamble Co.*, 463 F. Supp. 2d. 596, 605 (W.D. La. 2006) (citing *Kampen*, 157 F.3d at 316). The LPLA defines "reasonably anticipated use" as "a use or handling of

10

a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. R.S. 9.2800.53(7). The relevant inquiry is "what uses of its product the manufacturer [objectively] should have reasonably expected at the time of manufacture." *Kampen*, 157 F.3d at 309. Under the LPLA, "a manufacturer will not be responsible for 'every conceivable foreseeable use of a product.'" *Id.* at 309-10 (quoting *London v. MAC Corp. of America*, 44 F.3d 316 (5th Cir. 1995)).

"When a manufacturer expressly warns against using a product in a certain way in clear and direct language accompanied by an easy to understand pictogram, *it is expected that an ordinary consumer would not use the product in contravention of the express warning*." *Kampen*, 157 F.3d at 313 (quoting *Lockart v. Kobe Steel Ltd. Const. Mach. Div.*, 989 F.2d 864, 867 (5th Cir. 1993)). In such cases, "the plaintiff's 'use' of the product will not be a reasonably anticipated one, unless . . . 'the plaintiff[] [presents] evidence that despite the warnings, [the manufacturer] should have been aware that operators were using the [product] in contravention of certain warnings." *Id.* at 314 (quoting *Lockart*, 989 F.2d at 868). If a warning against the use in issue exists, and "a plaintiff presents no evidence about whether the manufacturer should have reasonably expected users to disregard the warning, the plaintiff fails to meet the burden imposed on him by the LPLA." *Id.* at 314-15 (citing La. R.S. 9.2800.54(D)). Thus, the Court's inquiry is two-fold. The Court must ask (1) whether

11

defendants warned against the use at issue, and (2) whether, notwithstanding this warning, defendants should have reasonably expected users to disregard the warning.

*Kampen* is an example of application of these principles. In *Kampen*, the plaintiff used a tire jack to raise the front end of a car to inspect its underside. 157 F.3d at 308. Plaintiff placed his head and shoulders underneath the vehicle, at which point, the jack failed causing the car to crush him. *Id.* at 309. There, the owner's manual for the jack instructed users to use the jack for changing tires only and warned users never to get beneath the car when using the jack. *Id.* Because of this clear warning and the lack of a genuine issue as to whether users were disregarding this warning, the Fifth Circuit held that the plaintiff failed to show that the use was reasonably anticipated. *Id.* at 318.

Here, the uncontroverted evidence demonstrates that plaintiff used the press without guarding. Initially, the Court finds that the record shows that defendants provided a clear and direct warning against this use through a warning label affixed to the press: "Guard workpiece to prevent projectiles from reaching operator." A pictogram, showing an individual being struck by projectiles, accompanied the warning. The press's instruction manual also stated: "Guard workplace to prevent projectiles from reaching operator. Mount ½" below stop block or at eye level centered on flange as shown." Despite the warnings, plaintiff used the press without any form of guarding and was injured by a projectile ejected from the press. Plaintiff's use and injury are

12

exactly the type the warning, accompanying pictogram, and product manual address.

Referring only to the warning label affixed to the press, plaintiff contends that this warning is ambiguous because the label states "guard the workpiece," and "workpiece" refers to the object being worked on. According to plaintiff, the warning does not necessarily prescribe a guard that would have prevented the accident at issue because he could have guarded the workpiece but not the scrap metal shaft the press ejected towards him. But the clear import of the warning is that the operator must not operate the press without guarding so as to avoid projectiles reaching the operator. No fair reading suggests that one could safely use the press without any form of guarding.

Because defendants provided clear and direct warnings against plaintiff's very use, plaintiff must show that defendants should have reasonably expected users to disregard the warning or have reason to know the warning was otherwise ineffectual. *Kampen*, 157 F.3d at 314-15; *Broussard v. Procter & Gamble Co.*, 517 F.3d 767, 770 (5th Cir. 2008) ("[P]laintiffs who used a product in a manner that violates clear and express warnings can show that their use was reasonably anticipated only by presenting evidence that the manufacturer had reason to know that these warnings were ineffectual."). If he fails to do so, his claim fails. *See Kampen*, 157 F.3d at 314-15 (requiring plaintiff to present "evidence about whether the manufacturer should have reasonably expected users to disregard the warning").

13

Defendants offer the declaration of Brian Phillips, a safety coordinator at Dake.[40] He states that Dake has "never provided guarding for its generic presses," because a one-size-fits-all guard for generic presses "could not be made to be compatible with all of the myriad operations of its customers."[41] Phillips explains that "Dake does not know the size and shape of the objects that will be placed into the generic presses, and therefore has no idea what the proper dimensions of any guard would be."[42] Phillips also states that Dake specifically instructs purchasers of generic presses through its product manuals and warning labels to install a safety guard against projectiles.[43] According to Phillips, "Dake has no reason to believe that its instructions and warnings will not be followed."[44]

Defendants also offer the declaration of their engineering expert, Michael Taubitz.[45] He states that "[i]ndustry practice is now and has always been that the purchasers of generic presses are

---

[40]   R. Doc. 55, Ex. A (Declaration of Brian Phillips).

[41]   *Id.* at 2.

[42]   *Id.* Similarly, Robert Hamberger, an engineer technician at Pellerin who designed the guards later affixed to several presses at Pellerin, testified that before designing a guard, he talked to the operator of the press to determine the largest part that goes into the press to ensure the guard would not be too small. R. Doc. 55, Ex. L at 24.

[43]   R. Doc. 55, Ex. A at 2.

[44]   *Id.*

[45]   R. Doc. 55, Ex. G (Declaration of Michael Taubitz).

the parties that are charged with fabricating guarding."[46] Taubitz points to Occupational Safety and Health Administration (OSHA) regulations, specifically 29 C.F.R. 1910.212, and American National Standards Institute (ANSI) standards, specifically ANSI B 11.2 (1995), which require employers to provide guarding for hydraulic presses.[47] Taubitz opines that "[m]anufacturers such as Dake cannot foresee that purchasers of hydraulic presses would fail to install guarding contrary to longstanding industry practice, applicable OSHA regulations, and the specific instructions provided by Dake to Pellerin."[48]

Consideration of the OSHA and ANSI standards confirm Taubitz's opinion. OSHA regulations, which apply to employers, provide, in relevant part:

> One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are-- barrier guards, two-hand tripping devices, electronic safety devices, etc.

29 C.F.R. 1910.212. Further, several courts have highlighted the applicability of this standard to employers.[49] *See Fernandez v. Spar Tek Indus., Inc.*, No. C.A. 0:06-3253-CMC, 2008 WL 2185395, at

---

[46] *Id.* at 5.

[47] *Id.*

[48] *Id.*

[49] Plaintiff argues that the OSHA regulation requires manufacturers to provide guarding, but provides no support for this interpretation.

\*11 (D.S.C. May 23, 2008) (noting that the regulation "is directly applicable to an *employer's* duty to provide a safe workplace" (emphasis in original)); *Jones v. Cincinnati, Inc.*, 32 Mass. App. Ct. 365, 369, 589 N.E.2d 335, 338 (1992) (stating that the regulation mandates that guarding be provided "by the *employer*" (emphasis in original)).

Likewise, ANSI B 11.2, E4.2.3. (1995), provides:

> Typically, the employer is in the best position to determine the hazards associated with the point of operation of the hydraulic power press production system (including feeding and material handling hazards and hazards associated with operation of auxiliary equipment). The employer is responsible for designating the appropriate point-of-operation safeguarding and to ensure that it is provided and used.

ANSI standards also state that employers should consider the hazards associated with the care and use of the press, which include "[o]bjects ejected from the die space during normal operation."[50] ANSI B 11.2, E5.1.2. The Fifth Circuit likewise recognized such an industry custom. *See Gordon v. Niagara Mach. & Tool Works*, 574 F.2d 1182, 1185 (5th Cir. 1978) ("In accordance

---

[50] Again, plaintiff contends that the ANSI standards require manufacturers to provide guarding, but points to no specific ANSI provision stating such. Likewise, Hansen, plaintiff's engineering expert, opines that the ANSI standards require the manufacturer to install guarding on hydraulic presses. In support, Hansen cites generic ANSI standards specifying that safety shall start with the manufacturer and that the supplier is generally responsible for design, construction, modification, installation, and safeguarding. Hansen, however, ignores the more specific ANSI guidance directly on point stating, "The employer is responsible for designating the appropriate point-of-operation safeguarding and to ensure that it is provided and used." Hansen's selective reading of the ANSI standards does not create an issue of fact.

with the custom in the power press industry, the selection of dies and appropriate guarding or safety devices was left to the purchaser.").

In opposition, plaintiff presents no evidence suggesting defendants should have expected users to disregard the warnings and use the press without guarding.  Instead, plaintiff points to the existence of the warning to guard against projectiles alone as evidence that defendants were aware end users may operate the press without a guard.  The Fifth Circuit has recognized that "a warning against a product *misuse* is relevant to assessing what uses of its product a manufacturer reasonably anticipates," but a plaintiff must still present evidence showing that "the manufacturer should have reasonably expected users to disregard the warning." *Kampen*, 157 F.3d at 314.  Pointing to the existence of the warning alone is insufficient.  Plaintiff also argues in conclusory fashion and without evidentiary support that because Dake has sold hydraulic presses since the 1940s, it "unquestionably *could have* reasonably anticipated that its products would be used without guards . . . ."[51]  This does not necessarily follow because Dake's manufacture and sale of hydraulic presses since the 1940s is equally consistent with Dake reasonably expecting purchasers of its press to supply guarding in accordance with longstanding industry custom.  Notably, plaintiff asserts only that defendants "could have" reasonably anticipated the use, not that they in fact did so

---

[51]    R. Doc. 65 at 9 (emphasis added).

or should have done so. Plaintiff's conclusory argument devoid of any evidence of users' nonconforming uses or of why defendants should have known of or expected such uses fails to raise an issue of fact to defeat summary judgment.

The record shows that defendants provided a clear and direct warning against plaintiff's use--using the press without guarding against projectiles--and that defendants should not have reasonably anticipated that plaintiff would disregard the warning. That defendants should not have reasonably anticipated plaintiff's misuse is bolstered by the industry custom, standards, and regulations supporting defendants' position that employers, not manufacturers, should supply guarding. Indeed, the Fifth Circuit has recognized previously that a manufacturer should not be expected to "reasonably anticipate" a non-conforming use when "[w]ell-accepted industry standards from the American National Standards Institute (ANSI) and regulations from the Occupational Safety and Health Administration (OSHA) provide in great detail" specifications for proper use. *Taylor v. United Techs. Corp.*, 117 F. App'x 961, 963 (5th Cir. 2004).

Accordingly, because plaintiff fails to present a genuine issue of material fact as to whether his use was reasonably anticipated and the Court finds that the evidence demonstrates that it was not, defendants are entitled to summary judgment.

18

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment. Accordingly, the Court DISMISSES plaintiffs' claims WITH PREJUDICE.

New Orleans, Louisiana, this __9th__ day of July, 2015.

_____*Sarah Vance*_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE